F

## COMMONWEALTH OF MASSACHUSETTS

**WORCESTER, ss.**

**SUPERIOR COURT
NO.** 20cv389D

---

**LOUISE BARRON, JACK BARRON, and
ARTHUR ST. ANDRE,**

**Plaintiffs,**

v.

**DANIEL L. KOLENDA, Individually and as he
is a Member of the SOUTHBOROUGH
BOARD OF SELECTMEN, and BRIAN SHEA,
MARTY HEALEY, LISA BRACCIO, AND
SAM STIVERS, Individually and as they are
Members of the SOUTHBOROUGH BOARD
OF SELECTMEN, and THE TOWN OF
SOUGHBOROUGH,**

**Defendants.**

# FILED

APR 03 2020

ATTEST ～～ CLERK



---

## COMPLAINT AND JURY DEMAND

### THE PARTIES

1. The Plaintiff, Louise Barron (Ms. Barron), is an adult resident and citizen of the Town of Southborough, Worcester County, Massachusetts.

2. The Plaintiff, Jack Barron (Barron), is an adult resident and citizen of the Town of Southborough, Worcester County, Massachusetts.

3. The Plaintiff, Arthur St. Andre, is an adult resident and citizen of the Town of Southborough, Worcester County, Massachusetts.

4. The Defendant, Daniel L. Kolenda ("Mr. Kolenda"), is an adult resident and citizen of the Town of Southborough, Worcester County, Massachusetts.

5. The Defendants Kolenda and Brian Shea, Marty Healey, Lisa Braccio, and Sam Stivers are elected members of the Town of Southborough's Board of Selectmen ("the Board") with an address of Southborough Town House, 17 Common Street, Southborough MA 01772.

6. Defendant Town of Southborough. ("the Town"), is a municipal corporation organized under the laws of the Commonwealth with its principal office located at 17 Common Street, Southborough MA 01772.

## JURISDICTION AND VENUE

7. Venue is appropriate in this Court under G.L. c. 223, §§1 and 8(3,) as the activities in question are within this judicial district and the conduct giving rise to this action took place within this judicial district.

8. Jurisdiction is appropriate in this Court under G.L. c. 212, § 4.

## FACTUAL ALLEGATIONS

### The Barrons

9. Ms. Barron first moved to the Town of Southborough with her husband, Jack Barron, in 1986.

10. The Barrons have two adult children, each of whom attended Southborough public schools from kindergarten through high school graduation.

11. The Barrons were active participants and volunteers in the Southborough public school system while their children were students there.

12. Ms. Barron was taught since adolescence to stay informed of local issues and to be an advocate on issues of importance to her.

13. The Barrons believe that civil engagement is the responsibility of every citizen.

14. More specifically, the Barrons believe that every citizen who is able should vote in all municipal, state, and federal elections, and should pay attention to, and participate in, matters of local government.

15. As a result, the Barrons, individually and together, have always strived to keep themselves informed of local issues that impact the Town of Southborough and its residents.

16. Given their active participation, there have been times over the decades that the Barrons have been critical of local leaders.

17. When they have felt it to be necessary, the Barrons have vocally criticized questionable decisions and inappropriate conduct by local officials.

### Daniel Kolenda

18. For many years, Daniel Kolenda has held positions of power and influence in the Town of Southborough ("the Town").

19. Pursuant to Massachusetts law, the five-member Board of Selectmen ("the Board") is the Town's chief executive.

20. Mr. Kolenda has been an elected member of the Board since at least May of 2011.

21. Pursuant to G.L. c. 39, § 16, Southborough has an Advisory (Finance) Committee, which is charged with considering all questions of municipal finance and making budget recommendations to the Town Meeting, which serves as the Town's Legislative body.

22. Prior to being a member of the Board, Mr. Kolenda was appointed by a previous Board to the Advisory Committee.

23. Prior to his appointment to the Advisory Committee, Mr. Kolenda was a member of the School Committee.

24. Mr. Kolenda has been in local leadership positions for many years.

<u>The Barron's Local Civic Engagement</u>

25. Louisa and Jack Barron have been advocates and critics on many local issues.

26. For example, in or around 1997, Ms. Barron discovered that the Board was planning to sell real property to Scott and Eileen Ewing without compliance with local or state laws relative to the municipal disposal of real property.

27. The Barrons' understanding was that the Ewings had personal connections to member/s of the Board, and that the Town had failed to notify the public that the property at issue was available for purchase.

28. On information and belief, one of the members of the Board who was connected to the Ewings was William J. Christensen. Christensen, a longtime member of the Board, was sentenced in 2007 to five years in prison for federal child sex solicitation crimes and to state charges of enticing a child under age 16.

29. When the Barrons found out about the Board's plan to sell the land, they filed a complaint with the Massachusetts Inspector General.

30. The Barrons also caused an Article to be inserted on the Town Meeting Warrant prohibiting the illegal transfer.

31. As a result of the Barrons' efforts, the illegal land transfer did not occur, and the Town adopted a new policy for the disposition of land.

32. In 1998, in response to what the Barrons regarded as several troubling decisions made by Southborough's Town Counsel, Attorney Frederick A. Busconi, the Barrons caused an Article to be inserted on the Town Meeting Warrant which would establish oversight of the Town Counsel.

33. Although the article did not become part of the Town Code, the Board of Bar Overseers suspended Attorney Busconi's license to practice law due to his professional misconduct in 2002.

34. After Attorney Busconi lost his license, he was removed from his position as Town Counsel.

35. Another example of the Barrons' advocacy was their opposition to local efforts to withdraw from regionalization and build stand-alone schools for Southborough students.

36. The Barrons' opposition to the proposed Southborough schools was based on the projected costs to Southborough taxpayers.

37. One member of the Town's K-8 Temporary Town Planning Committee ("K-8 Committee"), David Davidson, also sat on the Town's Advisory Committee-- which was the appointing authority for the K-8 Committee.

38. The Barrons were vocal critics of Mr. Davidson, who was also an attorney.

39. In 2000, the Massachusetts Supreme Judicial Court ("SJC") suspended Mr. Davidson's license to practice law.

40. Despite the suspension of Mr. Davidson's license to practice law, Martin Healey, Chair of the Advisory Committee, refused to remove Mr. Davidson from the K-8 Committee.

41. The SJC later found that Mr. Davidson continued to practice law even after his license was suspended.

42. In 1999, the Barrons were the impetus for a citizens' petition Town Meeting Warrant Article that would have prohibited expending any more funds on pursuing non-regional schools.

43. The Article complied with all requirements of state and local law, but the Board failed to include it on the Town Meeting Warrant.

44. As a result, the Barrons, through counsel, filed a complaint with the Attorney General.

45. The local press covered the Board's failure to include the Article, which the Town claimed was the result of a clerical error.

46. In 2000, at a public meeting, two members of the Board angrily berated and ridiculed members of the public who were critical of the Board

47. As a result, Ms. Barron authored a letter to those Board members, criticizing them for their "inexcusable and intolerable" behavior and suggesting that they participate in an anger management program.

48. Ms. Barron's letter was made public.

49. In 2012, the Barrons began advocating that the Board provide residents who contracted for private refuse collection with access to the recycling facilities at the Southborough transfer station.

50. In 2014, after the Board failed to act, the Barrons spearheaded a citizens' petition Warrant Article requiring access to recycling facilities for all residents.

51. Although the Barrons' Article passed, Mr. Kolenda ensured that the access to recycling facilities was cut off the following year.

52. In or around 2006, Mr. Barron became a member of the Southborough Open Land Foundation ("SOLF"), a private organization founded to preserve, protect, and enhance the natural resources of the Town of Southborough.

53. In that capacity, Mr. Barron advocated for conservation restrictions that ultimately prevented the Board from selling parcels of land for private development.

54. Ms. Barron was one of the citizens who petitioned to have a Special Town Meeting to propose the purchase of a 60-acre golf course for perpetual preservation with no future development allowed.

55. Although the Town purchased the land for $27 million, it then used a portion of it as the site for a new public safety facility.

56. The Barrons were vocal critics of the proposed public safety facility, which they believed was unnecessarily expensive and inappropriate.

### The Park Central Development

57. In 2016, the Southborough Zoning Board of Appeals ("ZBA") approved permits for a massive and lucrative new housing development that would increase the size of the Town by nearly 10%, known as "Park Central."

58. The permit applicant for the Park Central project was a developer ("the Developer") with many business and personal connections to Southborough officials.

59. Along with many other Southborough residents, the Barrons were vocal opponents of the Park Central development.

60. One of the permits issued to the Developer by the ZBA was a use variance that allowed residential use on industrially zoned property.

61. Southborough is one of the few Massachusetts municipalities that still allowed use variances, which have been described as "the greatest source of danger to the integrity of the zoning process, while at the same time being the most difficult to justify legally." Report of the Department of Community Affairs Relative to Proposed Changes and Additions to the Zoning Enabling Act, Mass. H.R. Rep. No. 5009 at 65 (1972).

62. After the ZBA's award of the use variance to the Developer, the Barrons initiated a citizens' petition Warrant Article to eliminate use variances from the Town's Zoning Code.

63. After overwhelming passage of that Article, the Barrons remained vocal critics of the Park Central use variance, which had already been awarded.

64. The Barrons had also been vocal opponents of another use variance application, one which sought the installation of a large, 24-hour illuminated, digital billboard, which is prohibited in Southborough and was ultimately rejected by Town Meeting voters.

65. At a February 2018 public meeting of the Board, the Town Administrator, Mark Purple, reported to the Board that town officials had been participating in talks with the Developer which included the possibility of connecting Park Central to town ways via a new road—which would be constructed across the private property of an abutter.

66. The Town had failed to notify that abutter that his land would be discussed; the abutted was alerted during the Board's meeting and appeared to publicly object to the proposal.

67. The abutter stated that meetings held concerning his land without his knowledge had "a sinister feel."

68. On information and belief, the Town's Economic Development Committee was involved in and/or facilitated those discussions.

69. Several members of the EDC were (and are) attorneys with the law firm that regularly represents the Developer--or otherwise have ties to him.

70. When the events at the meeting were covered in a popular local blog, Ms. Barron made a series of comments—including links to various parts of the video recoding of the meeting (available on youtube).

71. In her comments, Ms. Barron criticized Town officials for assisting a private developer by creating access to the massive Park Central development over a resident's property.

72. Ms. Barron also pointed out several disturbing inconsistencies in the Town Administrator's statements with respect to the access discussions.

73. Ms. Barron publicly commented upon conflicts of interest of members of the EDC and their apparent assistance of the Developer--with whom they had known business relationships--in the Developer's attempts to gain needed access to the Park Central Development.

74. Ms. Barron pointed out that Mr. Kolenda had been known to be involved in the Park Central development's "access" discussions for over two years, but that he had tried to give the appearance of knowing nothing about them at the February 2018 meeting.

75. Ms. Barron stated near the end of her post the following:

> MEMO TO MR. KOLENDA ET AL:
>
> • Stop having these meetings and conversations behind the taxpayers' / public's back. It skirts the whole purpose and spirit of Open Meeting Law.

• You have lost major voter support (and your mind) if you think the taxpayers (through a grant or otherwise) [are] paying for a private developer's roadway.

• Butt out: stop using taxpayer's money, BOS's valuable time, the public's valuable time, and town hall resources, before any developer has figured out their own access and infrastructure issues. NOT OUR PROBLEM!

76. In response to later comments, Mr. Barron posted the following:

One would expect the town to be neutral in its position — not this town. Town counsel is actually sitting next to the developer's attorney in court (?!! — this virtually never happens) and being paid taxpayer dollars. What's wrong with this picture??

Starting back in 2016, Messr.s Purple, Kolenda, and Cimino are actually helping the developer (actions speak louder than words!) by ENDORSING the concept of a north – south road in favor of a private developer without ever contacting the actual private owner of the property — not necessary, I guess??!! Just so outrageous.

Again, regarding Mr. Purple, contrast his so-called Planning Board update at the recent BOS meeting with his disavowal of any knowledge later in the same meeting. He then thanks the public for keeping him "honest" in his response in the next My Southborough article. But in the same meeting is reporting that the town will need to "carry the water . . ." Can you believe this?? That doesn't sound neutral to me.

Picture this: Here is the Town Administrator (??!!) commenting / reporting that the Town Residents "carry the water. . ." And Mr. Kolenda is suggesting in the same meeting that Mr. Purple be elevated to Town Manager (??!!)

Town Residents wake up! Do you think this is to keep town business in the public eye, in public meeting?? Or behind closed doors. Reader: you be the judge.

### Misappropriation of Town Funds

77. In 2019, the Barrons learned about the misappropriation of town funds by an employee of the Recreation Department.

78. Mr. Kolenda had always been a staunch advocate of Recreation Department budget requests, including many for artificial turf.

8

79. The accounts of Recreation Department misappropriations were especially disturbing given the fact that an employee of the local school district had recently been charged with embezzlement of almost $400,000, a crime to which he had plead guilty.

80. Following reliable accounts of the Recreation Department misappropriation, the Barrons inquired about safeguards the Town had instituted and how the employee had overridden those safeguards.

81. The Barrons also questioned whether all misappropriated funds had been repaid to the Town.

82. The Town Administrator and Board refused to answer the Barrons' questions.

83. Believing that all residents are entitled to information concerning Town Officials' stewardship of public funds, the Barrons sought the answers to their questions via public records requests and requests for the Board's withheld meeting minutes.

84. The Board, however, through counsel, refused to provide any meaningful information.

### The Board's Abuse and Cover Up

85. On December 4, 2018, Ms. Barron attended a Board meeting.

86. At that meeting, a budget presentation was made by the Town's Treasurer/Collector, Brian Ballantine, concerning the Town's budget for the following fiscal year.

87. Mr. Ballantine advised the Board that a substantial increase of local real estate taxes would be necessary in order to a <u>level service</u> budget.

88. Mr. Ballantine presented the range of potential tax increases that would be necessary. which depended upon various decisions the Board made with respect to the provision of services.

89. The Board indicated that it was open to a significant budget increase.

90. During the budget presentation, Mr. Kolenda even advocated for full funding of the Recreation Department's requested budget, which included $270,000 for the installation of artificial turf in a water detention basin that is periodically used as an athletic field.

91. At the same time that Mr. Kolenda advocated for full funding of the Recreation Department's budget request, the Board discussed slashing the road improvement line item in the Department of Public Works budget request by $250,000 to $450,000.

92. After the budget presentation, the Board reviewed scores of meeting minutes that it had failed to review and approve as required by law.

93. During that review, the Town Administrator very quickly acknowledged that the Attorney General ("AG") had recently found that the Board had committed dozens of violations of the Open Meeting Law.

94. In fact, the AG had recently authored a scathing letter ordering every member of the Board to attend an in-person training that the AG's Office planned to conduct in Southborough.

95. The AG's letter was reported in an article in the Worcester Telegram on November 12, 2019.

96. The AG's letter specifically criticized  Town Counsel's comments which characterized the  Open Meeting Law complaints as "frivolous" and minimized the importance of correcting violations as "ministerial," noting that that was "likely to encourage the Board to disregard the seriousness of its obligations under the Law.  By contrast, the issues raised here are significant and the violations we find go to the heart of the Open Meeting Law."

97. After only briefly acknowledging the AG's determinations, the Town Administrator acknowledged that additional Open Meeting Law complaints were likely to be filed because of breadth and scope of the Board's violations.

98. In response to that comment, Mr. Kolenda stated: "we are a group of volunteers" and "public servants" who "do their best."

99. Mr. Kolenda's comments were a clear minimization of the fact that the Attorney General had found that the Board had committed serial violations of the Open Meeting Law.

100.    Mr. Kolenda's comments were especially noteworthysince he is a licensed attorney who is presumably capable of understanding the requirements of the Open Meeting Law.

101.    Mr. Kolenda then announced a series of donations and payments that had been made to the Town, and, as part of that list, stated that the Board would "assign OML complaint to town counsel as is standard practice."

102.    Because he had announced the assignment of an open meeting law complaint to Town Counsel as part of a list of receivables, and due to his use of the acronym "OML", any member of the public observing this meeting would likely have missed the import of the last item Mr. Kolenda announced.

103.    Specifically, the words "assign OML complaint to Town Counsel" meant that yet another complaint had been filed with the Attorney General asserting that the Board had again violated the Open Meeting Law, and that the taxpayers would again have to foot the bill for the referral to Town Counsel to review and respond to the Board's latest violation.

104.    As the December 4, 2018 meeting continued, the Board considered the scope of authority it would give to the committee it was newly creating to explore the elevation of the Town Administrator to the position of Town Manager.

105.    Such an elevation would presumably come with a salary increase.

106.    Once the Board had completed that task, more than two and a half hours after the meeting began, Mr. Kolenda announced that it was time for the public comment segment of the meeting.

107.    The Board had previously adopted a policy entitled "Public Participation at Public Meetings" which states:

> All remarks and dialogue in public meetings must be respectful and courteous, free of rude, personal or slanderous remarks. Inappropriate language and/or shouting will not be tolerated. Furthermore, no person may offer comment without permission of the Chair, and all persons shall, at the request of the Chair, be silent. No person shall disrupt the proceedings of a meeting. Finally, while it true that State law provides that the Chair may order a disruptive person to withdraw from a meeting (and, if the person does not withdraw, the Chair may authorize a constable or other officer to remove the person from the meeting), it is the position of the BOS that no meeting should ever come to that point.

108.    Before opening the meeting for public comment, Mr. Kolenda read the following portion of the Board's public participation policy: "All remarks must be respectful and courteous, free of rude, personal or slanderous remarks."

109.     Ms. Barron approached the audience lectern with a "cheap but meaningful" sign that she had made herself; one side read "Stop Spending" and the other side read "Stop Breaking Open Meeting Law."

110.     Ms. Barron began by voicing her objection to the proposed budget increases that had been discussed earlier in the meeting, expressing her view that the Board was engaged in irresponsible spending.

111.     Ms. Barron next asked for an explanation of the benefit of having a Town Manager as opposed to a Town Administrator.

112.     In response, Mr. Kolenda stated that questions would not be answered and that there would be "no back and forth during public comment."

113.     Ms. Barron accepted this, stating "very good," but then another member of the Board offered Ms. Barron a response to her question.

114.     Ms. Barron then turned her attention to the Board's Open Meeting Law violations found by the Attorney General.

115.     Ms. Barron stated: "And you say you're just merely volunteers and I appreciate that, but you've still broken the law with Open Meeting Law and that is not the best you can do.  And when you say 'this is the best we can do' I know it's not easy to be volunteers in town but breaking the law is breaking the law."

116.     Mr. Kolenda interrupted Ms. Barron and stated: "So ma'am if you want to slander town officials who are doing their very best—"

117.     Ms. Barron interjected by saying "I'm not slandering" but Mr. Kolenda cut her off again.

118.     Mr. Kolenda stated:" Then we're going to go ahead and stop this public comment session now and go into recess."

119.     Ms. Barron had waited nearly three hours for her opportunity to publicly voice her concerns, and she was now being prevented from doing so, as if the Town was dictatorship and not a democracy.

120.     Mr. Kolenda made clear that he was unilaterally terminating both Ms. Barron's public comment and the Board's meeting.

121.     Frustrated, Ms. Barron stated: "You need to stop being a Hitler.  You're a Hitler.  I can say anything I want."

122.     Kolenda again interrupted stating "We are moving into recess.  Thank you."

123.     Mr. Kolenda did not offer a motion to move into recess or to end the Board's meeting, nor did any other Board member.

124.     The Board took no vote to adjourn, suspend, or otherwise to discontinue the meeting.

125.     Through this point in time, Mr. Kolenda's remarks and actions were captured on the audio/video recorded by Southborough Access Media ("SAM") for live presentation of the Board's meeting through the Town's public access cable channel.

126.     Instead of moving to adjourn, Mr. Kolenda looked pointedly in the direction of the SAM staffer, presumably indicating that the staffer should stop recording the meeting.

127.     At the same time, Mr. Kolenda made deliberate contact with the power button on his microphone stand.

128.     The audio feed then suddenly ended for those observing the meeting remotely through the Town's public access cable channel, but the video feed lasted 13 seconds longer.

129.     During the silent video, Mr. Kolenda can be seen standing and angrily and menacingly pumping his arm repeatedly in a pointing gesture at Ms. Barron while yelling.

130.     Mr. Kolenda was yelling at Ms. Barron: "You're disgusting! You're disgusting! You're disgusting!"

131.     Mr. Kolenda then threatened to have Ms. Barron, a disabled senior citizen and a grandmother, "escorted out" of the meeting if she did not leave at the very time she was exercising her rights to freedom of speech, assembly, and petition.

132.     Mr. Kolenda's intimidating, aggressive and humiliating rant took place in front of two other members of the Board (Brian Shriffrin and Bonnie Phaneuf), the Town Administrator, the Board's secretary, other Southborough residents still present in the room, the SAM staff, and Town residents who were watching the meeting live, or at a later time.

133.     No other Board member moved to intervene or stop Mr. Kolenda's abusive verbal assault of Ms. Barron.

134.     Ms. Barron was frightened, shocked, and humiliated by Mr. Kolenda's language and conduct.

135.     Ms. Barron left the meeting before Mr. Kolenda could act on his threat to have her removed by force.

136.     At its next meeting on December 18, 2018, the Board reviewed the draft minutes from its December 4th meeting.

137.     The draft minutes falsely stated that that "Mr. Kolenda moved the meeting to adjournment at 9:06 P.M., seconded by Mrs. Phaneuf."

138.     The draft minutes also failed to include any reference to Mr. Kolenda's violent and disturbing verbal attack of Ms. Barron, as if it had simply not occurred.

139.     Selectmen Shea, who had recused himself from the December 4th meeting prior to Ms. Barron's public comment, stated while discussing the draft minutes that as he was returning to the meeting room on December 4th, he heard Mr. Kolenda state that the Board was "going into recess" before he ended public comment.

140.     Mr. Shea's statement is utterly contradicted by the audio and video recordings of the December 4th meeting.

141.     While discussing the draft minutes, selectwoman Bonnie Phaneuf also stated that Mr. Kolenda had "adjourned the meeting" on December 4th.

142.     The Board approved the draft minutes of its December 4, 2018 meeting by a vote of 5-0.

143.     Those approved minutes falsely state that "Mr. Kolenda moved the meeting to adjournment at 9:06 P.M., seconded by Mrs. Phaneuf."

144.     The December 4, 2018 incident was reported in the MetroWest Daily News and was discussed on a local blog, MySouthborough.com.

145.     Mr. Kolenda, who had unilaterally ended a public meeting and menacingly and repeatedly shouted "you're disgusting!" at a disabled senior citizen in response to her criticism, told the press that he was calling "for greater civility in

14

public discussion of town business" and described his "exchange" with Ms. Barron "an uncomfortable incident."

146.     Ms. Barron remains shaken, distraught, and deeply humiliated by this incident.

147.     The incident has caused Ms. Barron ongoing humiliation in the Town that has been her home for decades, and has caused her to cease participation in all town meetings, an activity she had pursued her entire adult life out of a sense of civic duty.

148.     On the popular local blog, MySouthborough.com, after watching the video footage of the incident, one reader noted the following: "[Mr. Kolenda] should have been thrown out with the police escorting him out due to his violent and scarily inappropriate threatening behavior, audio or no audio.  No matter what any resident is asking[,] it does not ever warrant screaming threats, calling a resident names, thrusting a pointing finger in a harassing manner."

149.     Another resident noted: "I have considered getting involved in public service and don't.  It is the Dan Kolenda's not the Ms. Barron's of the world that prevent me from serving."

## Count I
## G.L. c. 12, § 11I, Violation of Massachusetts Declaration of Rights, Article 19 and the First Amendment to the United States Constitution
### (Kolenda, Shea, Healy, Bracccio and Stivers)

150.     The Plaintiffs repeat and re-allege all allegations set forth above, and incorporate the same herein by reference.

151.     Article 19 of the Declaration of Rights of the Massachusetts Constitution provides all Massachusetts residents with the "right, in an orderly and peaceable manner, to assemble to consult upon the common good; give instructions to their representatives, and to request of the legislative body, by the way of addresses, petitions, or remonstrances, redress of the wrongs done them, and of the grievances they suffer."

152.     At the Board's meeting on December 4th, 2018, Ms. Barron exercised and attempted to exercise her constitutionally protected rights to assemble, speak in a peaceable manner, and petition her town leaders for redress.

153.    Mr. Kolenda interfered with and deprived Ms. Barron of her rights by silencing her, verbally and physically intimidating her, and threatening to have her forcibly removed from the Board's meeting.

154.    Mr. Kolenda took those actions to silence Ms. Barron's criticisms of himself and the Board, and thus he intended to suppress the particular content of Ms. Barron's speech.

155.    Mr. Kolenda's deprivations were intentional as they resulted from his disagreement with Ms. Barrons's views, his personal animosity towards the Barrons, and/or his reckless indifference to Ms. Barron's constitutional rights.

156.    Mr. Kolenda's threats, intimidation and coercion, and the Board's approval of the same through its acquiescence by its silence and its adoption of false meeting minutes, were done under color of state law as the Board members were elected members of the Board acting as the Town's Chief Executive.

157.    Mr. Kolenda's actions and the Board's acquiescence served to chill Ms. Barron and other residents from expressing criticism of the Board for fear of similar abusive treatment.

158.    As a result of Mr. Kolenda's and the Board's violations, Ms. Barron has suffered damages, harm, humiliation, and distress for which Mr. Kolenda and the Board, are liable.

### Count II
### 42 U.S.C. § 1983, Violation of the First Amendment to the United States Constitution
(Kolenda Shea, Healy, Bracccio, Stivers and Town of Southborough)

159.    The Plaintiffs repeat and reallege all allegations set forth above and incorporate the same herein by reference.

160.    The First Amendment to the U.S. Constitution gives all citizens the right to free speech, free assembly, and to petition their representatives for redress of grievances.

161.    At the Board's meeting on December 4th, 2018, Ms. Barron exercised and attempted to exercise her constitutionally protected rights to free speech and assembly and to petition her town leaders for redress.

162.    Mr. Kolenda, with the tacit approval of the other Board members who

were present, interfered with and deprived Ms. Barron of her rights by silencing her, verbally and physically intimidating her, and threatening to have her removed from the Board's meeting room.

163.     Mr. Kolenda took those actions to silence Ms. Barron's criticisms of himself and the Board, and thus he intended to suppress the particular content of Ms. Barron's speech.

164.     Mr. Kolenda's deprivations were intentional as they resulted from his disagreement with Ms. Barrons's views, his personal animosity towards the Barrons and/or his reckless indifference to Ms. Barron's constitutional rights.

165.     Mr. Kolenda's actions and the Board's approval of the same through through its acquiescence by its silence and its adoption of false meeting minutes, served to chill Ms. Barron and other residents from expressing criticism of the Board for fear of similar abusive treatment.

166.     Mr. Kolenda's threats, intimidation and coercion and the Board's approval of the same were done under color of state law as the Board members were elected members of the Board acting as the Town's Chief Executive.

167.     As a result of Mr. Kolenda's and the Town's violations, Ms. Barron has suffered damages, harm, humiliation, and distress for which the Mr. Kolenda, the other Board members, and the Town are liable.

### Count III
### G.L. c. 30A, § 23(f)
### Violation of the Massachusetts Open Meeting Law
(Kolenda, Shea, Healy, Bracccio and Stivers as they constitute the Board)

168.     The Plaintiffs repeat and reallege the allegations set forth above, and incorporate the same herein by reference.

169.     The purpose of the Open Meeting Law is to ensure transparency in the deliberations on which public policy is based.

170.     Pursuant to G..L. ch. 30A, §20(a), "all meetings of a public body shall be open to the public."

171.     Also pursuant to G.L. ch. 30A, §20(f), "any person may make a video or audio recording of an open session of a meeting of a public body."

172.     No motion, second to a motion, and majority vote was ever made to recess, adjourn or otherwise suspend the Board's December 4, 2018 meeting.

173.     Therefore the December 4, 2018 Board meeting was ongoing during Mr. Kolenda's abusive rant and threat to have Ms. Barron physically remobved from the Board's meeting room.

174.     By unilaterally shutting off and directing SAM staff to shut off the audio and video feed of the Board's December 4, 2018 meeting, Mr. Kolenda shut off the viewing public's access to an ongoing public meeting., and thereby violating G..L. ch. 30A, §20(a)

175.     By unilaterally shutting off and directing others to shut of the audio and later video feed of the Board's December 4, 2018 meeting, Mr. Kolenda also interfered with Southborough Access Media's right to audio record an open session of a public meeting in violation of G.L. ch. 30A, §20(f).

176.     The other Board members present acquiesced to Mr. Kolenda's violations by remaining silent during Mr. Kolenda's abusive rant and threat to have Ms. Barron removed.

177.     Pursuant to G.L. c. 30A, § 22, public bodies are required to create and maintain minutes of all meetings that are true and accurate.

178.     G.L. c. 30A, § 22 also requires that minutes accurately reflect the decisions made and the actions taken by public bodies.

179.     The minutes of the Board's December 4, 2019, violate the Open Meeting Law because they fail to include Mr. Kolenda's angry and abusive comments directed at Ms. Barron and his threat to have her removed.

180.     The Board's minutes of its December 4, 2019, violate the Open Meeting Law, because they falsely state that "Mr. Kolenda moved the meeting to adjournment at 9:06 P.M., seconded by Ms. Phaneuf."

181.     All Board members voted in favor of approving meeting minutes which were patently false.

182.     The Plaintiffs as Southborough residents suffered harm from the Board's violations of the Open Meeting Law which intentionally obscure what actually occurred at an open meeting of the Town's chief executive.

183.    As a result of the Board's intentional violations of the Open Meeting Law, the Court should require the Board to amend its minutes to reflect Mr. Kolenda's abusive statements and indicate that no vote to adjourn was taken.

184.    As a result of the Board's intentional violations of the Open Meeting Law, the Court should impose civil penalties on the Board.

**Count IV**
**Declaratory Judgment**
(Town)

185.    The Board's "Public Participation at Public Meetings" policy is unconstitutional because it is not content neutral.

186.    Specifically, the Policy states that "[a]ll remarks and dialogue in public meetings must be respectful and courteous, free of rude, personal or slanderous remarks. . . . Furthermore, no person may offer comment without permission of the Chair, and all persons shall, at the request of the Chair, be silent."

187.    The Policy does not allow for criticism of public officials or their decisions if the Chair decides that such criticism is not "respectful" or "courteous" or if the Chair finds such comments "rude" or "personal."

188.    The Policy is not narrowly tailored to serve any permissible interest and is not the least restrictive means to serve any legitimate interest.

189.    Mr. Kolenda acted to violate Ms. Barron's Constitutional rights – and the remainder of the Board acquiesced in those violations – in part in reliance on the unconstitutional policy.

190.    The Court should declare that the above quoted portions of the Policy are unconstitutional.

191.    The Court should declare that the Defendants may not regulate protected speech during any time period designated for speech by the public based on the content of the message of the speaker, the view point of the speaker, or their desire to avoid criticism, ensure "proper decorum", or avoid "personal" or derogatory or even defamatory statements, unless such regulation is the least restrictive means necessary to achieve a compelling government interest;

192.    The Court should declare that the Defendants may not regulate speech

during any time period designated for speech by the public other than in compliance with valid, constitutional, written policy which includes definite, objective standards for the regulation of speech, adopted by the Board in accordance with all relevant laws and regulations.

## JURY TRIAL DEMANDED

The Plaintiff demands a trial by jury for all counts so triable.

WHEREFORE, the Plaintiff demands judgment against the Defendants and requests that this Honorable Court:

a) Find that the Defendants deprived Ms. Barron of her federal and state constitutional rights under color of state law;

b) Enter an award against the Town and the Board for compensatory damages for the injuries Ms. Barron suffered as the result of those deprivations;

c) Enter an award against Mr. Kolenda personally for punitive damages pursuant to 42 U.S.C. § 1983 for his evil intent and/or

d) Enter injunctive relief requiring the Board to amend its meeting minutes to reflect Mr. Kolenda's abusive comments and the Board's failure to properly adjourn the meeting.

e) Enter the Declarations set forth in Court IV, above;

f) Award Ms. Barron her reasonable attorneys' fees for violation of her constitutional rights; and

g) Grant such further and other relief as this Honorable Court deems just and proper.

Respectfully submitted by
the Plaintiff through her counsel,

Ginny S. Kremer, Esq. BBO#629147
Christopher Alphen, Esq.
Blatman Bobrowski & Haverty LLC
9 Damonmill Square Suite 4A4
Concord, MA 01742
(978) 371.2226
ginny@bbhlaw.net
Date: 3/30/2020



| CIVIL ACTION COVER SHEET | DOCKET NUMBER<br>20 cv 382 D | Trial Court of Massachusetts<br>The Superior Court |
|---|---|---|

| | |
|---|---|
| PLAINTIFF(S):   Louise and Jack Barron | COUNTY |
| ADDRESS:   11 Sadie Hutt Lane, Southborough MA | Worcester |
| Arthur St. Andre, 17 Sadie Hutt Lane Southborough MA | DEFENDANT(S):   Daniel L. Kolenda, Individually and as a member of the |
| | Southborough Board of Selectmen, Brian Shea, Marty Healey, Lisa Braccio and Sam Stivers, |
| ATTORNEY:   Ginny Sinkel Kremer, Esq. | individually and as they are Members of hte Southborough Board of Selectmen |
| ADDRESS:   Blatman Bobrowski & Haverty, LLC | ADDRESS:   Southborough Town House |
| 9 Damonmill Square, Concord, MA 01742 | 17 Common Street |
| | Southborough MA 01772 |
| BBO:   629147 | |

### TYPE OF ACTION AND TRACK DESIGNATION (see reverse side)

| CODE NO.<br>AE1, D13, | TYPE OF ACTION (specify)<br>Open Meeting Law violation, Declaratory Judgm | TRACK<br>A | HAS A JURY CLAIM BEEN MADE?<br>☒ YES       ☐ NO |
|---|---|---|---|
| *If "Other" please describe: | Constitutional Claims | | |

2

### STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff counsel relies to determine money damages.  For this form, disregard double or treble damage claims; indicate single damages only.

#### TORT CLAIMS
(attach additional sheets as necessary)

A. Documented medical expenses to date:
    1. Total hospital expenses ............................................................... $ _____
    2. Total doctor expenses ................................................................. $ _____
    3. Total chiropractic expenses ......................................................... $ _____
    4. Total physical therapy expenses .................................................. $ _____
    5. Total other expenses (describe below) .............................. Subtotal (A): $ _____

**FILED**

**APR 03 2020**

**ATTEST** _____ **CLERK**

B. Documented lost wages and compensation to date ................................. $ _____
C. Documented property damages to dated ................................................ $ _____
D. Reasonably anticipated future medical and hospital expenses ............... $ _____
E. Reasonably anticipated lost wages ....................................................... $ _____
F. Other documented items of damages (describe below) ........................... $ _____

G. Briefly describe plaintiff's injury, including the nature and extent of injury:

TOTAL (A-F):$ _____

#### CONTRACT CLAIMS
(attach additional sheets as necessary)

Provide a detailed description of claims(s):

TOTAL: $ _____

Signature of Attorney/Pro Se Plaintiff: X _____       Date: 3/30/2020

**RELATED ACTIONS:** Please provide the case number, case name, and county of any related actions pending in the Superior Court.

### CERTIFICATION PURSUANT TO SJC RULE 1:18

I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

Signature of Attorney of Record: X _____       Date: 3/30/20